UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL BOWERS | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| v. | : | JURY DEMAND |
| THOMOS JEFFERSON UNIVERSITY | : | |
| Defendant. | : | |

***COMPLAINT***

***PARTIES***

1. Plaintiff, Paul Bowers is an adult individual domiciled and residing 205 Susan Drive, Riverton, New Jersey 08077.

2. Defendant, Thomas Jefferson University ("TJU") is a private university offering four-year undergraduate and graduate degrees in a wide range of baccalaureate programs and studies including nursing, medical and doctorate programs, having a campus and place of business at 1020 Walnut Street, Philadelphia, Pennsylvania 19107.

***JURISDICTION AND VENUE***

3. Jurisdiction over the action is conferred upon this District Court pursuant to 28 U.S.C.§1331, in that the cause of action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*., and related federal regulations, and invokes the gender anti-discrimination provisions of that law.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(e), in that the administrative (EEOC) charge was accepted and opened in this district, defendant resides in this district, plaintiff at all times relevant and material worked for TJU in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## ***FACTUAL BACKGROUND***

5. Paul Bowers (male) began his employment with TJU on March 25, 2019 and for nearly seven years served as Director of Academic Technology and Design at the Jefferson College of Nursing (JCN), reporting to Assistant Dean Hannah Smith (female).

6. Mr. Bowers was one of approximately seven men among more than 120 employees at the College of Nursing.

7. From the outset of Mr. Bowers's employment and continuing through his termination, the College of Nursing maintained a female-heavy leadership structure where male employees were systemically excluded from decision-making authority, leadership access and advancement opportunities.

***The College features a culture of gender animus against males in employment***

8. For most of his employment, Mr. Bowers was the only director level employee excluded from the College's "executive leadership" group, which consisted entirely of women; in the last three years another male was hired, and he was also excluded from executive leadership.

9. Despite being the most senior individual with formal instructional design experience (Heather Fry also had this experience), Mr. Bowers was routinely excluded from academic decision-making and strategic discussion that fell squarely within his area of responsibility.

10. Mr. Bowers was excluded from the "Dean's Suite", a recurring leadership meeting where decisions affecting the entire College were made. No men were included in this group.

11. Female employees in positions equal or lower than Mr. Bowers, including Katherine White and Gabrielle Santulli, were included in these meetings and afforded leadership

access and advancement opportunities not offered Mr. Bowers or other men.

12. Ms. Santulli attended these meeting even prior to her promotion into senior leadership, and both Santulli and White were promoted to Assistant Vice-President (AVP) positions and moved to offices near the Dean.

13. In addition to exclusions from leadership, the College maintained a physically and organizationally segregated campus environment that limited male employee's access to leadership and influence.

14. The Dean's office and executive leadership were located at 901 Walnut Street, 8th floor surrounded exclusively by favored female leadership. No male employee had an office on that floor.

15. Most male employees including Mr. Bowers were assigned to the physically distant, older and less integrated Edison Building (7th and 8th floors), away from leadership and the Dean's presence, limiting visibility and advancement opportunities for men at the College.

16. Male employees were largely absent from leadership roles across the College including non-nursing functions such as education and technology where gender parity would be expected.

17. For example, the MATER Program staff (11 employees) included only one male with no men in leadership roles; upon MATER's integration into JCN, this gender imbalance worsened and across JCM (135 employees), fewer than 10 are men and none occupy senior leadership roles.

18. The College's leadership culture reflected gender-based stereotyping and denigrating attitudes toward male employees. During a leadership discussion regarding staffing, the Dean (female) referred to hiring a "little Zoom boy" to provide technical support; the

comment was made in the presence of female leadership personnel and was received as acceptable and met with humor.

19. This comment reflected a broader pattern at the College where male employees were viewed as subordinate technical support rather than as leaders or subject matter experts.

20. There was a pattern of marginalization and attrition of male employees at the College. Male colleagues experienced repeated restructuring, reassignment of duties, denial of advancement opportunities, or left the College under circumstances suggesting unequal treatment.

***<u>Hannah Smith targets plaintiff on the basis of his gender</u>***

21. For several years prior to termination, Mr. Bowers experienced persistent supervisory overreach by his direct supervisor, Assistant Dean Hannah Smith. Dr. Smith repeatedly bypassed Mr. Bowers by assigning important work directly to his sole direct report, Heather Fry (female), without his knowledge or approval.

22. These were not minor or isolated requests; they materially affected departmental priorities and undermined Mr. Bowers's authority. When Mr. Bowers would raise concerns, the conduct would temporarily stop, only to resume again.

23. When away on vacation in June-July 2025, Dr. Smith inserted herself into Heather Fry's promotion process, despite his explicit instruction to the contrary, and coordinated directly with senior leadership including the Dean without Mr. Bowers's knowledge or approval.

24. Concerned that his authority was systemically undermined, and to align and maintain control of his staff, Mr. Bowers submitted an EthicsPoint report to the College in late June/early July 2025.

25. Mr. Bowers's report documented Dr. Smith repeatedly bypassed his authority, asserted unilateral interference in Ms. Fry's promotion process during his leave, and Smith's attempts to condition Ms. Fry's advancement on projects outside proper reporting lines.

26. Mr. Bowers's authority and expertise in academic strategy, instructional design and technology continued to be minimized. In the Fall of 2025, as planning for the new Lehigh Valley campus were underway, responsibility for instructional design and academic technology planning fell squarely within Mr. Bowers's role.

27. Dr. Smith injected herself into the planning and assumed Mr. Bowers's responsibilities for the technology integration and instructional technology needs and assumed the tasks without Mr. Bowers involvement, eliminating his opportunity to demonstrate director expertise to advance in leadership.

28. Hannah Smith had minimal experience in this area. She had a PhD in Genetics but no formal training or qualifications in nursing or education, instructional design or academic technology. Her domain expertise had no relevance to Mr. Bowers's work.

29. Minimization and exclusion of Mr. Bowers in his director role was not based on performance or qualifications. It was based on gender-biased culture and assumptions about authority that exalted women over men in nursing education and academia more broadly.

30. In early November, 2025, Mr. Bowers formally escalated his concerns to Associate Dean Dr. Holly Harner. Mr. Bowers disclosed the history of issues and requested a change in reporting structure to secure a clean professional break from Dr. Smith.

31. Mr. Bowers followed up his request in writing and provided documentation. He did not refuse work or file administrative action; he only sought structural protection to maintain

Department integrity so he could perform his role effectively. Mr. Bowers's request was never addressed by the College.

***<u>Hannah Smith's request for an agenda for the December 8, 2025 meeting was pretext</u>***

32. Shortly after this escalation, in early December, 2025, Dr. Smith told Mr. Bowers to submit an agenda to her before circulating it to the academic program chairs, so that she could review it and provide feedback for the December 8, 2026 meeting.

33. Mr. Bowers explained to Dr. Smith the meeting was only an initial exploratory faculty-driven meeting for their input on programs NU560, 570 and 673 – the type of meeting Mr. Bowers held with faculty chairs regularly during his tenure.

34. The exploratory meeting did not require a "formal" agenda; even if it did, Mr. Bowers had already communicated the agenda to Dr. Smith and the chairs in anticipation of their attendance, and invited Dr. Smith's input.

35. These types of initial meetings are open-ended so faculty attending can help shape the direction before any project outline is drafted and additional content driven meetings are held, at which time an agenda *would* be prepared.

36. This new requirement for an exploratory meeting "agenda" was a new directive of Dr. Smith and not a policy or directive of the College and was not imposed on other directors, only Mr. Bowers.

37. In 15 years as an Instructional Designer and 25 years in Higher Education, including 7 years as Director of Academic Technology and Design at the College, Mr. Bowers was never requested to submit a formal meeting agenda for supervisory review or approval for the type of meeting Mr. Bowers was leading on December 8, 2026.

38. Mr. Bowers explained that a formal agenda was unnecessary for this type of

meeting; Smith demanded a level of specificity in the agenda that was virtually impossible to achieve, and excessive and inappropriate given his role and responsibilities as a director and out of line with the type of meeting planned.

39. Mr. Bowers did not refuse to provide an agenda but only challenged the purpose behind this "first time demand" for an agenda for this type of initial meeting where the content had already been provided in advance.

***TJU terminates Mr. Bowers on plain pretext***

40. On December 9, 2025, Mr. Bowers received a meeting invitation labeled only as a "workplace conduct discussion" for the afternoon of December 10, 2025.

41. On December 10, 2025, Mr. Bowers attended the meeting with Assoc. Dean [Dr.] Holly Harner, Dr. Smith and HR representative Kristen Kelleher. At the meeting, Mr. Bowers was told he was refusing to follow directives.

42. Mr. Bowers explained he did not refuse to follow a directive or to perform his duties, but questioned Dr. Smith's new directive that was inconsistent with his role as director and unsupported by policy or prior practice.

43. Mr. Bowers reiterated he had twice previously requested a change of report and that Dr. Smith was assigning work directly to Mr. Bowers's direct report, causing disruption in his department.

44. During the meeting, Mr. Bowers was told he must accept the existing supervisory structure and comply with Dr. Smith's directive as presented or resign his position.

45. Mr. Bowers responded that he did not agree the directive was appropriate or applicable in its context, but never stated he was resigning. Ms. Kelleher then stated TJU would "accept" his resignation.

46. Mr. Bowers did not submit a written resignation and later emailed TJU to clarify that he had not resigned. Neither Drs. Smith nor Harner spoke during the meeting, and the structure of the meeting appeared rehearsed and aimed at securing Mr. Bowers's resignation.

47. After Ms. Kelleher stated that TJU had accepted his resignation, ID badge was confiscated, his IT work access was disabled, and he was required to clear out his office immediately. Security personnel escorted Mr. Bowers from the building.

48. Later that day, Mr. Bowers received "Workday" documents reflecting he was terminated, followed by COBRA notices also confirming termination.

49. No written termination letter, justification of the separation, or separation documents were provided to Mr. Bowers despite his request through an EthicsPoint report and directly through HR.

50. During his entire tenure at TJU, Mr. Bowers was never warned or told his conduct violated any written standard or policy of TJU, and he had never been disciplined or warned of misconduct or placed on any type of performance or other disciplinary plan.

51. Dr. Hannah Smith took over Mr. Bowers's position and duties, despite her minimal subject matter experience or relevant background in Mr. Bowers's work or position at the College.

52. Only after these actions did TJU begin characterizing the separation as voluntary. The reclassification carried harsh financial consequences. By labeling the separation a resignation, TJU denied severance and limited payment of accrued Earned Time Off.

53. At the time of separation, Mr. Bowers had accrued approximately 314 hours of Earned Time Off. TJU paid only 160 hours and declined to provide the written policy governing that limitation upon his request.

54. Based on TJU's published guidelines for severance applicable to his role, Mr. Bowers was eligible for a minimum severance benefit. He received none.

55. On December 11, 2025, Mr. Bowers filed an EthicsPoint report that his separation was not over a policy or workplace violation or performance related, but was characterized by TJU as a voluntary resignation even though he never resigned or submitted a resignation.

56. Despite repeated requests for follow up and review, TJU never responded to Mr. Bowers's EthicsPoint report.

57. On April 6, 2026, Mr. Bowers timely filed a formal claim for severance benefits under TJU's severance policy. TJU never responded to the claim. Severance was never paid.

58. On April 15, 2026 plaintiff filed an amended charge of discrimination against TJU with the EEOC (no. 530-2026-03026) asserting gender discrimination in his employment and termination.

59. On June 3, 2026 plaintiff received his determination of charge and notice of right to sue letter from the EEOC, and plaintiff has exhausted.

## ***COUNT I***

***(Title VII of the Civil Rights Act of 1964)***
***Disparate Treatment- Gender***
***v.***
***Thomas Jefferson University***

60. Plaintiff incorporates herein by reference paragraphs 1 through 59, inclusive, as though the same were more fully set forth at length.

61. On the basis of gender as to all employees in his department, and as an employee of the College and TJU as a whole, plaintiff was a member of a protected group as defined under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*.

62. Plaintiff at all times relevant was qualified, trained, experienced and fully competent to perform his job duties and assignments as Director of Academic Technology and Design.

63. Plaintiff at all times relevant was qualified, trained, experienced and fully competent for retainage and longevity in his position as Director of Academic Technology and Design.

64. Plaintiff was treated disparately compared to women at the College in his exclusion from academic decision-making and strategic discussions; exclusion from the "Dean's Suite; segregation from women leadership; and assignment to offices segregated from female leadership where men were relegated to "not seen-not heard" status.

65. Plaintiff was treated disparately compared to women at the College in his exclusion from access to advancement opportunities offered to women in subordinate roles compared to plaintiff, such as Ms. White and Ms. Santulli who advanced to senior AVP roles over plaintiff who had superior qualifications.

66. Plaintiff, and all male employees at the College, were treated disparately in the culture of gender-based stereotyping where men were viewed as subordinate technical support rather than as leaders (or potential leaders) or subject matter experts, and expendable.

67. Plaintiff was treated disparately compared to women at the College where Hannah Smith (female) re-assigned his work, and high-profile work, to his direct report (female), denigrating plaintiff's role and position and elevating the role of subordinate females.

68. No other woman at the College suffered re-assignment of work to her direct report under circumstances where it happened to plaintiff.

69. Plaintiff was treated disparately compared to women at the College when his own supervisor (female) assumed his leadership role as director of the academic technology planning for a new campus, eliminating an opportunity to demonstrate expertise to advance.

70. No female director or employee in a comparable position sustained this type of exclusion or interference in high-profile work, or was stripped of responsibilities specific to her role.

71. Plaintiff was treated disparately compared to women at the College, and targeted for termination, when Hannah Smith directed plaintiff to provide an agenda for an exploratory meeting where the agenda was already provided, and was in essence, a superfluous “folly”.

72. No female director or employee assigned to run an initial exploratory meeting was ever asked to provide a formal agenda for the meeting, or targeted for termination for asking her supervisor why such an agenda was necessary in the first place.

73. Plaintiff was treated disparately compared to women at the College, and targeted for termination, for questioning the reason and policy behind an agenda for an informal meeting, and then told to follow the directive or resign his position.

74. No woman in any position comparable to plaintiff at the College was ever told to follow a forced unnecessary directive that made no sense, under threat that resignation was required if the directive was not obliged.

75. No woman in any position comparable to plaintiff at the College was ever told to submit a forced resignation for questioning a directive for a meeting agenda that was already in place and known to leadership, under threat of a forced resignation.

76. No woman in any position comparable to plaintiff at the College was ever labeled

"resigned" where no resignation was submitted, the employee never resigned, and the College used the "resigned" label to avoid severance benefits.

77. The College attempted to force a resignation that plaintiff never submitted, and then labeled plaintiff "terminated", under conditions that are *prima facie* pretext.

78. The College deliberately and intentionally treated plaintiff disparately in his employment based on gender.

79. The College deliberately and intentionally treated plaintiff disparately in attempting to force a resignation plaintiff never submitted, and then labeled plaintiff "terminated" based on gender.

80. As a result of TJU's unlawful actions and conduct directed to plaintiff in his employment, plaintiff has suffered significant losses in salary, medical benefits, severance benefits, accrued unpaid time off, pension and profit- sharing benefits and accoutrements of employment, and other harm including reputation and economic harm and damages.

81. As a result of TJU's unlawful actions and conduct directed to plaintiff in his employment, plaintiff was foreclosed of opportunities to advance and promote to positions of higher-level leadership at the College.

82. As a result of TJU's unlawful actions and conduct, plaintiff was precluded from progressive higher salaries and bonuses and accoutrements he would have earned and enjoyed in higher level leadership positions.

83. Plaintiff has thereby suffered significant losses in retirement benefits and accouterments that, but for the gender discrimination, would have accrued and plaintiff would have enjoyed.

84. Plaintiff, for all the reasons articulated above, suffered adverse employment action at the hands of TJU.

85. TJU acted with illegal discriminatory motive towards plaintiff based substantially (and/or solely) on gender.

86. As a result, plaintiff has suffered harm and damages.

87. TJU, acting as aforesaid, discriminated against plaintiff under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*., and related federal regulations and has willfully violated the Title VII laws.

88. TJU acting as aforesaid, engaged in such illegal discriminatory practices with malice or with reckless indifference to the federally protected rights of the plaintiff.

WHEREFORE, plaintiff, Paul Bowers demands judgment in his favor and against defendant, Thomas Jefferson University for monetary damages, compensatory damages (including back pay, wage accruals, merit raises, bonuses, prejudgment interest), severance benefits, accrued unpaid time off, denial of progressive wage increases due to non-advancement, accruals in retirement benefits, incidental and consequential damages and liquidated damages in excess of $ 150,000, exemplary and/or punitive damages, injunctive relief and/or affirmative relief as determined by the court necessary to effect the purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*., and related federal regulations, together with attorneys' fees and costs, costs of suit, and for such other relief as the Court deems just.

*/s/ J. Stephen Woodside*____________
J. Stephen Woodside
Attorney for plaintiff, Paul Bowers

J. STEPHEN WOODSIDE, P.C.
One Belmont Avenue
GSB Building-Suite 324
Bala Cynwyd, PA 19004
(610) 278-2442
(610) 278-2644 (fax)
*jstephenwoodside@verizon.net*

DATED: August 28, 2026

## ***JURY DEMAND***

Plaintiff demands trial by a jury of twelve (12) persons on all issues so triable.

*/s/ J. Stephen Woodside*____________
J. Stephen Woodside

Dated: August 28, 2026